Case number 23-1091, Consumers' Research et al. Petitioners vs. Federal Communications Commission and United States of America. Mr. Kelsen for the petitioners, Mr. Carr for the response. May it please the court, Jared Kelsen for petitioners. I'd like to reserve four minutes. Each year, the FCC passively authorizes the collection of billions of dollars for telecommunication services from telecommunication carriers from their customers and their customers for the Universal Service Fund. The money is then used to subsidize telecommunication services across the United States. The amount dwarfs the annual appropriation for the FCC many times over. To give perspective, the Universal Service Fund budget for the second quarter of 2023, in this case, was $1.95 billion, which alone was roughly four times the FCC's appropriation for the whole year. This funding mechanism is categorically unique and it's premised on vague definitions of universal service and universal service principles, which the FCC and numerous courts have concluded are aspirational only. As Judge Newsom recently wrote, they provide no meaningful constraint but confer frontline in law and policymaking power on the agency. Such unbounded authority violates the non-delegation doctrine. Since you mentioned Judge Newsom's opinion, can we start there? Sure. And particularly on the private non-delegation issue, he said that USAC has little actual discretion because all of the contribution calculating formulas are fixed by FCC regulation. Do you have a reason why you think he was not correct about that? I think that the guidance that is given by the FCC to USAC still allows significant discretion to determine the amount of money to be appropriated. What areas do they exercise discretion over? Well, for example, USAC is the entity that makes the grants in the first place, because they're projecting how much they're going to be allotting to different entities. So even within the guidelines that the FCC has set forth, USAC still has discretion about whether they're talking about the decision about, okay, we should spend a total of, let's say, $10 billion this year, or are you talking about, okay, like this particular carrier should contribute this amount of money? My understanding of... Oh, so... What do you think USAC... You said USAC does this. Which of those two? USAC is looking at the grants it expects to be making in the upcoming quarter and using that to calculate... What do you think about disbursement, actually? Well, my understanding from the FCC's position is that the way that this is limited is they look at the disbursement to anticipate, and then they create a budget, and that USAC sends that budget to the FCC, and the FCC ministerially calculates what contribution facts will be necessary to provide that money to USAC for the grant. And Judge Newsome's separate opinion said he thinks that USAC's hands are tied, I think, in everything you just described, particularly in deciding the total amount of disbursements that should be made. So, is he wrong? I think if it were the case, we would disagree with that. If that were the case... What's your... Like the majority of the show me state, like, show me where I can look to see if Judge Newsome was wrong about that. There's nothing in the guidelines that tells USAC who to give the money to or how much to give to that those regulations limit the total amount that USAC can collect. There's still a significant amount of discretion that USAC has to operate within that world. I think that the most unique aspect of the situation that... With the regulations that say it has to be proportionately distributed and everyone should only have to carry their equal share, so that seems like a pretty significant limitation on what they charge each person. I think it's just math. They're just doing the math and dividing it up. So, those terms are necessarily vague, but equitable is a vague term. The fact that the contribution factor is fluctuating so much each quarter is evidence that there's a lot of discretion that's going into play here. I think it shows discretion. I think it just shows math numbers change and so math calculations change. I mean, do they have the ability to say, hey, I really like you, Company X. I'm not going to give you any charge this month. I really hate you, Company Y. I had terrible service with you a few years ago. I'm going to triple up what you have to pay. Is it that kind of discretion you're talking about? I think USAC has the ability to discern where it decides the need is and then to allocate the funds accordingly. There's an appeal process on the back end. We can't do what I said. We don't have that type of discretion in the calculations. As far as I'm aware, that sort of who you like and who you don't is not counted in the regulations. Who has to pay how much? They can't do it in any way other than mathematical facts. According to the contribution factor? Is that the question? What I'm asking you is when they do the math and then figure out who, here's our contribution factor. Now, that means this company owes this and this company owes that much. That part is based on the revenues. Right. That's not discretionary. No. No, it is not. It's getting to the contribution factor where the problem is. I think the biggest indication that there's a non-delegation issue here is the contribution. In this case, it's 29%. Can you define it? A decision is made for, let's say, the first quarter that universal service will require $4 billion. I think that's not the contribution rate, right? That's not the contribution rate. Okay. The contribution rate is in order to reach $4 billion this quarter, we're going to need to take out a certain amount of money from each carrier. That rate that decides what each carrier will pay is the contribution rate? This is a question. That's correct. Okay. Who takes the first shot at deciding what the contribution rate is? VSAC or FCC? The contribution rate is calculated by the Office of the Managing Director at the FCC. But that calculation is a ministerial calculation based upon projections, based on how VSAC projects its budget and expects to send its budget. It seems to me, I don't think that this necessarily hurts you, that although the contribution rate is kind of probably being decided by the FCC itself, the contribution rate is going to be based on the total amount of funds that universal service requires for that. Correct. And the decision on what the total amount of funds for universal service requires, that first cut decision is being made by VSAC. That is correct. I'm going to ask the FCC if they, he's nodding yes. I apologize if I misunderstood your question earlier, but that is a correct explanation. And then that leads to the question, let's say that VSAC said, well, last quarter it was $4 billion, but we think this quarter it should be $4.5 billion. Is there, and let's say, is it possible that that could be wrong? Is there a reg that you would compare that to? By what standard is VSAC making that decision? I think they're making it according to these general ideas about universal service. I think the important thing to recognize here is that that quarterly contribution factor, which is calculated based on USAC's projections, is subsequently deemed approved by the FCC if it takes no action within 14 days. And that is, I think, that's the crux of this problem, is that the FCC is rubber stamping these things through. I think I, maybe you just answered this, but it makes sense that the FCC would rubber stamp it if USAC isn't really bound by FCC-specific guidance. But if USAC is bound by FCC-specific guidance and they got out of line, then, you know, FCC would kind of crack down on that. And your point, I think, is that the FCC has not given them specific guidance on what you're calling the contribution factor. I'm going to call it the total amount of money that's spent that quarter. You're saying FCC has not given them specific guidance. About the total budget, projected budget. That is correct. I want to ask the FCC about that, too. So what's vague about universal service? This phrase has been around for 90 years. You keep saying these things are vague. What's vague about it? What's unconstitutionally vague about it? So I think that, first off, as an initial term, universal service has no sort of objective limitation. It's a very open-ended, vague phrase that is left to the discretion of the agency to define. Was it unconstitutional when universal service was implemented by the program with AT&T? You're talking before the 1996 act? Yes. That was implementing and collecting money to subsidize, to provide universal service. Was that an unconstitutional delegation to AT&T, a private entity? I think the situation was different back then. It was different, but was it an unconstitutional delegation because universal service is too vague? What I'm saying is that it did not raise the same non-delegation issue. Why? If universal service is vague and unknowable, why wouldn't it? Because at the time, those decisions were being made in the private market. In the private, excuse me, what was being made in the private, what, universal services? That would seem to be Congress delegated to private market. I don't know why you wouldn't have a delegation problem there. I mean, this phrase has been around for a long, long time, including through that period, and I didn't see any delegation challenges. The private entity, AT&T, was imposing costs on users, certain users to fund other users, to obtain universal service. Prior to 1960, a significant portion of the universal service program was prices that were being set by the FCC itself, and that was allowed for the cross-subsidization. It was a totally different regime than we have now. No, I want to get back to my question again. You said universal, the problem here is the term universal service is vague. That doesn't impose limits. So it was vague even under the AT&T scheme? Yes, it was vague under the AT&T standard. The mechanism which was being implemented was different than which this resolution- Why wasn't that an unconstitutional delegation? If you said it doesn't matter if it's FCC or AT&T, it was trying to figure out what it meant and how much to collect. I don't understand why your argument wouldn't equally indict that program. To the extent universal service was being implemented by private companies, it does not implicate the non-governmental entities. I'm sorry, but you just said under the direction of the FCC for delegation from Congress. This may just be my thickness, but I don't understand why under your theory of non-delegation, maybe you think the FCC rode tight on AT&T, but that doesn't answer the non-delegation question. There's nothing more specific to Congress than there is here on universal service, right? To the extent the FCC had the same discretion under the old program, it would have raised similar concerns, yes. Did they have the same discretion? I believe so. Okay. It just seems odd that things have been around for almost 100 years and someone now is just challenging. Well, the mechanism by which the FCC was implementing it didn't extract money. Wait, wait, wait. It most certainly did. It imposed essentially a fee or a tax, however you want to describe it, on urban customers to subsidize customers who were rural or yet didn't have access to service. Am I misunderstanding? The old system was based upon price fixing by the FCC that set standardized rates. It wasn't about introducing some sort of tax or fee that would then extract money from some consumers and give it to an agency to redistribute. Am I wrong in my understanding that the way it worked was AT&T would impose an additional charge on, for example, urban consumers of their telephone service and use that money, the FCC, to provide subsidized service by AT&T to non-urban customers? I could be completely wrong. My understanding of the old system is the FCC was setting rates across the fees that were tacked on and then there were cross-ups. Was there more direction from Congress as to what those rates should be to accomplish universal service? Was there any more direction from Congress or was there less? I am not entirely sure, but I think that there was probably less. It would still raise the same concerns. May I ask, I'm just trying to understand the implications of your private delegation arguments. Medicare program uses private insurance companies, generally called fiscal intermediaries. I think they've changed the name recently, but I'm going to use fiscal intermediaries to do endless calculations, computations, and determinations of the amounts of people are going to get from Medicare to hear their appeals and to even make initial decisions on challenges. Is that an unconstitutional private delegation, too? Because there, they actually get to hear the first-round appeal of a challenge to a disbursement. We have an adjudicatory role, which doesn't happen here. Is that unconstitutional, too, under your view? I can't claim to be an expert on the Medicare regime that Congress has implemented. What I can offer is that this court and U.S. Telecom made pretty clear that an agency can't simply rubber stamp the actions of private entities, that they have to independently exercise their reviewing authority and come to their own conclusion. Okay. I'm just trying to understand your argument. Your private non-delegation argument is nothing more than a rubber stamp one. Otherwise, it's perfectly fine if we actually were to find record evidence that the FCC has, in fact, reviewed and altered USAC determinations. I had thought there was more to it. I had thought it was not just that, but it was also too much delegation from Congress, and then diluted even further by delegating to private entities. Am I wrong? The private non-delegation issue here is aggravated by the fact that the finally tune exactly, I think, the question to your answer, the deemed approved RET mechanism is unconstitutional. If the FCC had independently reviewed the data before... They're deeming approved a number that they calculated. They're not deeming approved a number that USAC provided. They're deeming approved, kind of weird, but they deem approved a number that the FCC calculated. How is that improper? Because the number that the FCC calculated incorporated wholesale a projection from a private entity that was not reviewed. There's no evidence in the record that the FCC looked at the budget projections, that they agreed with them, that they made that determination on their own, and then used that to calculate the contribution factor. Instead, they've offloaded that function to a private entity who looks at... Okay. So, to your theory, though, then CMS, Center for Medicare and Medicaid Services, is going to have to go back and double check the math of every fiscal intermediary on every computation they do for every Medicare recipient in this country? Otherwise, it will be rubber stamping? Again, I'm very hesitant to express expertise on Medicaid regime. You have to have expertise. I'm not an expert on it either, but this is what happens. Fiscal intermediaries is what they do. They're intermediaries. They make the first round determinations, and they can be appealed. Of course, the first appeal is decided by the intermediary, and then that can be appealed to CMS. My question is, is it required that they go back and check... It seems to be what you're arguing here, that they need to go back and check the math and computations of USAC in order to avoid this private non-delegation problem. That's correct. The FCC must review... So, the implications of your argument are going to reach pretty far into other... I think that there are 40 years of precedent saying that rubber stamping is unconstitutional. What case do you have in mind that holds that? So, the idea being, assume that FCC's review authority here is just purely formal. Just going back to cases like Adkins, the problem before was the private entity was opposing and enacting binding regulations, and the fix was give the agency authority to reject or modify that. There wasn't a further inquiry into how often the agency modified what the private entity was doing. So, is there a case that actually engages in that type of analysis? So, I mean, I would start back with, for example, with the Sierra Club case that we cited. But up to, for example, in 2008, or sorry, in 2004, in this court's decision in US Telecom, the court said agencies may seek advice and recommendations from outside parties, but they may not rubber stamp decisions made by others under the guise of seeking their advice. I think that asking someone for their computations, for their assessment of data, that would fall under that broad category. Otherwise, it would allow, the point is that someone here is exercising authority that is affecting the private rights of US citizens, and the agency is taking that face value, rubber stamping it through, and it's imposing significant burdens on members of society. Under the Constitution, the agency has to make that decision. How do you define private rights? You operate under a license from the FCC. You have no right to engage in telecommunications without that license. So, you have to define private rights for me. I think, at least in this case, the ability to impose fees on a marketplace would implicate their pocket money. It can't be just this case. Are you bringing an SFI challenge? Well, we are only challenging the FCC's program here. Are you bringing an as-applied challenge or a facial challenge to the non-delegation? We're bringing an as-applied challenge to the 2023 second quarter contribution factor. As part of that challenge, this court's precedent and others allow the parties to raise challenges to the underlying statutory and constitutional authority of the agency's tax. How would one write an opinion in this case that would find an as-applied error here without taking down the entire scheme? How would you write that? This court's opinion only needs to address the 2023 second quarter. No, no, no. That's just not how these things work. All right? If we were to... What is peculiar... I know you say in your reply brief, but they didn't change the numbers from USAT this time. So, that doesn't show up or stamp. If we're only looking at this one quarter, you can't prove rubber stamping. You have no capacity to do that. All your arguments about rubber stamping in your brief cover long periods of time. But you're telling us now to only look at a single event, at which point we have no basis for finding rubber stamping. So, I'm very confused as to this. The very nature of a deemed approved program suggests or is indicative of rubber stamping. But the very nature sounds like a facial challenge to me. The fact that the FCC has committed the same violation in other contexts may be true. And this court's decision may have implications for other quarters, which the FCC has considered. There's nothing as... I'm trying to figure out legally what is... Because normally in an as-applied constitutional challenge, one says, what could be perfectly constitutional as applied all these other times. But there's something about these particular facts in this case. That's what as-applied is. I didn't read your argument to say all these other times, these other quarters, that can be perfectly constitutional. But there's something special about this quarter. And if I've misunderstood your argument, please help me understand what is special about this quarter that creates a constitutional problem that other quarters in the scheme overall would not. All I can offer the court is what happened in this case. It may have implications for others, but looking about the facts... What happened in this case that's special, that's unique, constitutionally unique? The specific numbers in the contribution factor at issue are a unique application. That's what gave the parties standing to sue. That's what brought them before this court. If this court's decision has implications for other quarters, that might suggest... That suggests a broader problem. But all I can offer the court is that in this case, there is no evidence in the record whatsoever that the commissioners actually reviewed the contribution factor, that they reviewed the projections by USAC, and that they came to their own independent determination that those were appropriate. And so it's leverage stamping. Because if it turned out that every other year of this program, they had reviewed them. And 50% of the time, they'd made some tweaks or and say, aha, this is one they didn't need to. Ergo, rubber stamping. Is that a plausible argument? I think it is a possible argument, given the fact that there's no evidence in this record that the FCC commissioners reviewed this contribution factor or the underlying... Evidence that they didn't? I mean, we assume that agencies fulfilled their legal... That's our starting assumption, that agencies have properly executed their duties under the law and constitution. So evidence is there that they haven't? Well, when the petitioners raised the possibility that there were problems here, the FCC provided no additional evidence that the commissioners had done that review. Okay. So absence of evidence does not mean a burden of proof. If your honor is looking for additional proof beyond that, then the history of the FCC not reviewing this. You've raised these exact same challenges in a number of other circuits and laws. Why do you not face issue preclusions raising those same arguments again in this court, since you haven't yet been able to identify anything peculiar to this quarter? Every time that the commission acts, it raises a new injury, and the parties are able to bring a challenge to that injury to the court. Okay. Go ahead. Go ahead. If you were to prevail here under the legal principles you're asserting, do you have a sense of how many other federal programs would, by that principle, be unconstitutional delegations? I'm not aware of any other program that deems approved calculations that are fully dependent upon the findings of private parties. So I can't point to any- Right here. Go ahead. I mean, I thought, when I get my pace down to Medicare, there's like a tax, like 50%. I think Congress has picked how much taxes I pay to Medicare. No, these are claims by hospitals for reimbursement for services. Sorry. Go ahead. Well, I think on the disbursement side, there may be similarities with a lot of programs. I thought your main argument was on the contribution side, not how much is, not who gets money, who has money taken. Yes. And the assessments against- And I think what you mentioned to me was this is an outlier program. Yes. I am not aware of any other agency that derives its funds, derives its funds, especially multiple times, its own agency budget from private parties based on these projections by private entities. There's a CFPB case in front of the Supreme Court. They heard oral arguments already. They haven't issued the decision. It has to do with CFPB raising, sort of determining, arguably, allegedly determining its own budget. Assume CFPB wins that case. Actually, are you familiar with the case? I'm generally familiar. Okay. If CFPB wins that case, does that hurt your argument here? The CFPB's funding is pegged to a statutory percentage that Congress has provided. There's no statutory percentage here. So that's the easiest distinction. Okay. What's the most sort of outlandish, expansive program that you think FCC or USAC, put a precise distinction for now, could call an aspect of universal service? And then I'm going to ask the government whether they think the statute allows the FCC to do. Well, as far as the statute goes? I mean, a lot of your argument and part of your discussion with Judge Blatt was their universal service is a clearly defined, easily knowable concept, or whether it's so vague that the FCC could say, have to fund a missile defense system as part of universal service in order to protect everyone's internet from getting bombed or something. I think that would be outlandish. That would not be part of universal service. So my question for you is, what's the most extreme thing the FCC could do that would still be within the statutory concept of universal service? I don't know that I'm prepared to say what the most extreme is, but there has been a public discourse about whether or not the FCC can extend charges to video streaming services to fund the universal service fund. Video streaming services? Oh, so like Netflix or- And then, so the idea is maybe they would say rural areas, we need urban areas to pay the cost of rural areas getting Netflix. The FCC has already expanded voice analog services to broadband or telecommunication services, which originally were voice analog services, now to have broadband communication or broadband internet. So the point is that if the FCC determines that something has broad discretion to redefine universal service, to define what is encompassed within universal service, and it just keeps reaching further and further. If you look at the history of this program, the universal service fee, the quarterly contribution rate started out around- Right. No, I got it. It's huge. Let me go to rural cellular two. And that opinion says, number one, this is not a tax, and number two, there's an intelligible principle. The government won that case if our court had said the opposite of those two statements. Let's just take the second sentence. Our court has said the opposite of there is an intelligible principle, had instead said there is not an intelligible principle for this delegation, the government would have lost the case, because it would have been an unconstitutional delegation. Right? I don't think that's debatable. Correct. Okay. So I think that means it was a holding, and we're bound by it, because I think a test for a holding is if the court could say the opposite of a statement and the judgment would be the same, fine, that's dicta. But if the court saying the opposite of a statement would by necessity change the judgment in the case, that's a holding. Maybe that's an overly simplistic test for holding versus dicta. But what do you think of that test? I think that in rural cellular two, the parties had not argued. Well- But you just want a question on the- Yeah, just in general, legal principles. And I'll give you a chance to talk to that rural cellular two, but- I think that- My test for holding and dicta is a good test. It wouldn't be just applicable in this case, it'd be applicable in every case we decide forever. I think that the test would require a little more nuance. Sometimes after the court has already resolved the case, it goes on to add additional factors or make additional statements that are not necessary to resolve it, even if they could have on their own. But here, it was necessary to say whether the federal action was constitutional or not, because if it had been unconstitutional, the government would have had to lose that case. Correct. The problem is in rural cellular two, the parties hadn't actually briefed a non-delegation problem under the intelligible principle test. They'd focus purely on a clear statement rule. The Supreme Court in McCutcheon said pretty clearly that- I remember the McCutcheon quote. I thought it was a good quote, it's helpful for you. I think stare decisis here works- our version of horizontal stare decisis works differently than the Supreme Court's version of horizontal stare decisis. The Supreme Court always sits the equivalent of en banc, so they're always at liberty to overrule one of their holdings. I think a three-judge panel here is not at liberty to overrule a three-judge panel precedent, so I'm not sure the McCutcheon quote gets you all the way there. The petitioner's position in this case is that the arguments were not raised in that case, and that the party should not be foreclosed on raising them here. If this panel determines that rural cellular two, that the statement about the non-delegation doctrine was a holding, then that would resolve the first issue in this case. What would it be? Because the argument there was there was an unconstitutional delegation of the taxing power. The first thing, of course, was it wasn't a tax, it was a fee. But that wouldn't answer whether it was an unconstitutional delegation of the taxing power. We just say it was a fee. And then the court said, in any event, there's an intelligible principle here. So there are two alternative holdings, right? Well, I didn't say the second one wasn't necessary, but there were two alternative holdings. I think that's a friendly question. Well, the fact that there were alternative holdings means the second one was not necessary. Not under our circuit preference precedent. We're quite clear that there's two alternative holdings for a ruling. They're both binding on another panel. Then again, I would just raise the fact that the arguments, that the parties never argued the intelligible principle test. They were arguing about a clear statement rule. And so the court was not faced with that. The court in the process, you've done excellent briefing in this case, but both sides, sometimes we don't always get the best briefing, but there are actually questions embedded in legal questions presented to us that are necessary for us to resolve to decide the case. At least I'm aware of a principle that says that they didn't brief it, but the court determined it necessary to make a holding. It no longer has stare decisis. In fact, for every stare decisis case, we have to go back and read the briefs. Is that right? I think that if the parties raised that proposition and can point to where in the briefs it was missing that that- For every stare decisis case, I have to go back and read the briefs in that case. I can't trust the panel. I think when the issue was not raised by the parties, I think that it raises the possibility. Even if the court thought it was necessary to determine? If this court determines that that was a binding holding, then that would result in- If the court thought it was necessary to resolve even though the briefing wasn't- I think that if the court had gone into some sort of significant discussion about why it satisfied the intelligible principle test- So the discussion wasn't long enough? It was a one-sentence passing reference after the court had argued- It wasn't in any event holding. So if we deem it as an alternate, it's not an accident in any event. It's usually how any event is used. There's an intelligible principle. So even if it were a tax, it would be an intelligible principle guiding it here. But that's not just loose commentary. Under this circuit's panel rule, if you determined that that was a holding that abides this panel, then that would resolve the No, that's great. Thank you. Thank you very much for your time. We'll give you some time to rebuttal. Good morning, your honors. May it please the court. My name is James Carr, and I represent the Federal Communications Commission. Let me start with Rural Cellular 2, just so you understand the background of that case. The petitioners in that case were making an argument under the Supreme Court's decision in CTA that there needed to be a narrowing construction of Section 254. Their position was that the FCC's reading of Section 254 in that void that situation, the court under the doctrine of constitutional avoidance should adopt petitioners reading Section 254. The commission in its brief responded in a couple of ways. First, it said, this isn't a tax, so it doesn't get involved with the whole issue of taxing. But more importantly, regardless, the commission's interpretation doesn't raise constitutional issues because there is an intelligible principle in the statute. So the parties did brief, to some extent, the intelligible principle test. The commission specifically raised it, and the court, in Judge Ginsburg's opinion, addressed both issues. First, this wasn't a tax. Second, even if it was, under the Supreme Court's Skinner decision, the same intelligible principle test applies to taxing delegations as to all other delegations. Can I ask you some questions along the lines of what I was asking the petitioner? I think if I remember right, universal service includes fast internet for schools? It does include internet access for schools and libraries. That's correct. So I assume that if the internet service moved at the speed of mud, you know, like in the 1998 days of dial-up, that would probably not be good enough for the schools. I think that's right, Your Honor. The universal service guarantee, as Judge Pilgrim noted in the 2018 AT&T decision, is dynamic, and therefore the commission takes account of technological changes. Who decides, when it comes to internet for schools, who decides how fast is fast enough? Is it the FCC or is it USAC? Well, the FCC would make policy judgments regarding the kinds of service that would be provided to the schools and what would be suitable. It's also important to recognize, Your Honor, there are extensive rules and regulations governing the schools and libraries program that require each entity that's receiving discounted service to put out for competitive bidding to all providers the possibility of providing service and then to select the most cost-effective provider. And you may not know, there's no reason to know this off the top of your head, but would it be possible to find out which FCC regulation says the internet service to the schools has to be a certain speed? There may well be a regulation. I don't know off the top of my head that there's a regulation that specifies the amount of speed. What counts as universal service? Yes. Does the statute answer that? I think the statute does answer that, Your Honor, and I think you have to read the statute. The Intelligent Principle case law talks about how you don't just read the text of the statute in isolation. You look at the context. You look at the purpose of the statute, the underlying factual background. That's been the test for the FCC. The FCC repeatedly applied that test. So here, in 1996, Congress decided to open up local telecommunications markets to competition. As a result, the existing universal service program couldn't go on as it had before because it relied largely on implicit subsidies. What statutory standard would a court review if someone said the FCC has deemed something part of universal service, but we don't think it's part of universal service? Well, I think what you would look at is 254C talks about the definition universal service, and it says that it is an evolving level of telecommunication services. So there's one limit right away. It's got to be a telecommunication service in order to qualify under section 254C1. Would a free cell phone for everyone in rural America be a telecommunication service? That would go more to equipment than to service. I think that raises an interesting question. That raises an interesting question. I think the commission, before it decided to authorize that sort of thing, would have to consider, among other things, the cost of providing that. And we've talked about that in the brief, that affordability, affordability- That answer is me. I suppose it's maybe, but again, Your Honor, it's subject to judicial review. The question here, remember- What would we be reviewing? By what standard would we be reviewing that? Well, you'd be reviewing... The court talked about the standard under Rural Cellular 1 and AT&T, that the commission can't just allow the system to grow unchecked, because if it does, it creates affordability problems for the people who are paying for the subsistence. You would want an Article 3 judge to be deciding that the standards provided in the statute, affordability, you could see a situation- Couldn't the court just say a service and product? Service and products are different? It could, yes. That's right, Your Honor. It could certainly say that. The FDC thus far required... I don't have any idea. It required the provision of iPads and everything? No. No. It's- It required the provision of any equipment other than the stuff that's needed, the wires and stuff? It's required internal connections and it's required internet access, so it's required the transmission. It hasn't required iPads or other facilities. Satellite internet service, a service? Telecommunication service? Satellite internet? Satellite service is different from telecommunication service, as I understand it, Your Honor. So that's- So the FCC did not say, we're going to use universal service to bring satellite internet service to all of rural America? I don't think so, Your Honor. No. There's a definition of telecommunications- There is a definition of telecommunications service in the statute. That's right, Your Honor. And that would limit the commission's discretion in choosing how to define universal service. I think also in section 254C1, there are various factors that the commission has to consider. Again, taking into account technological developments. And the court has found that this is a perfectly reasonable statutory provision. It's meant to show that the guarantee of universal service is dynamic, so that it changes over time in response to the adoption of technology. So for example, in 1934, when the commission was concerned about promoting universal service, people were using rotary telephones. And nowadays, most people aren't using landline phones at all. They're using wireless phones. And so the commission has made a transition over time to promoting mobile and broadband service, which are the more- You mentioned the possibility of funding Netflix for rural America. Is it conceivable that could be part of universal service? That's a trickier question, Your Honor, because it's not clear to me, again, that that falls within telecommunications service under section 254C1. What about the question of how much money is needed to fund universal service? I asked the is made by USAC. Is that correct? It is. But again, subject to FCC, I think this notion that somehow USAC is freeing the spending decisions- What are the- Can you describe in layman's terms what the rules on the front end are that- Sure. Sure, Your Honor. And we've listed some of the rules in footnotes 19 through 21 of the brief. First of all, you have eligibility requirements. So carriers cannot receive universal service funding unless they meet the eligibility requirements. There are requirements for high-cost funding, have to be an eligible telecommunications carrier as designated by a state commission. There are requirements for schools and libraries and rural telephone funding, or I'm sorry, rural healthcare funding, where parties have to show that they've put out for competitive bidding their request for service and that they've identified a provider that is cost-effective, among other things. So there's a very formal process. So USAC is not at liberty to start handing out money to those who are not eligible. And the projections have to take account of eligibility. They also have to take account that there are certain caps, limits on funding- This is my question. Don't the regulations specify the amount of funding, not in dollar amounts, but the method for calculating the amount that each eligible carrier can receive? They do, Your Honor. That was the third point I was using too, that there are for individual elements of universal service. And we talk about some of those regulations in footnote 21, that you have specific formulas for calculating the amount of discounts that schools and libraries receive, or the amount of subsidies received by rural healthcare providers. And in addition, there are caps on funding. There's an annual cap on rural healthcare funding, an annual cap on schools and libraries funding, a per-line limit- And that's all by FCC regulation? That's all by FCC regulation. And so- USAC's projections have to take account of all of those rules. When deciding how much total money is needed for universal service, does USAC need to exercise judgment? If it is exercising any judgment under the FCC's rules, if there's any question about how the rules were to apply, USAC is directed to come to the Commission and make inquiries about if there's some ambiguity about it, how a rule would apply. USAC is- As you're describing, they would at least kind of have to make judgment about whether they have to make judgment. If they say yes, then they would go against it. Yes. But it's also important to keep in mind, Your Honor, that the adoption of the contribution factor is not the end of the review process either. USAC decisions are subject to appeal, so that if an agreed party thought that USAC made the wrong decision, misapplied an FCC rule, it could appeal a USAC decision to the FCC. And we've pointed to some situations where the FCC has in fact granted relief, reversed USAC. With regard to the total amount of money that USAC takes a first cut by deciding will be spent for universal service that quarter, is it correct to say that FCC's active involvement is rare? I think that probably is fair to say. And again, Your Honor, I think that's largely because USAC is already confined by FCC. So typically when USAC is making its projections, those accurately reflect... Your involvement isn't rare. Your involvement is there and there all the time. It's there. It's rare in the sense that there haven't been that many changes at the stage where there is a deemed approval, where the projections come ahead. But the guardrails are already there. That's right. And the commission's intervention is not non-existent because there have been cases. And in fact, twice in 2023, the commission actually said, we're not going to take SAC's projections at face value. There are some unused funds from previous quarters. We're going to roll them into the numbers. I understand that. And I think that you said earlier, and this would be good for you, that if USAC just said, we're going to triple the budget of the universal service for the next quarter, so much so that it might be a hundred percent of carriers' revenues. USAC couldn't do that. That would be contrary to regulation or contrary to statute. It would certainly be statute in the sense that, again, when you're talking about the basic concept of universal service, the goal, which has been the goal of Congress and the FCC since 1934, has been to try to maximize the number of subscribers in the United States who are on the telephone network, who have access to reliable, affordable telephone service. And if FCC were to bless that, then someone could challenge that and the court would say, oh, that's contrary to statute. It would be inconsistent with the goal of universal service and it would drive people off those. Can I run through, I've got about six, seven things. Some of them may be products, not services, so that may be easy answers, but if it's conceivable, it could be part of universal service. Phone landlines, yes. Oh, landline service is definitely included. Cellular phone service? Yes. It's fast-wired internet? Could it be, not is it? Internet service for schools and libraries are already existing. Could fast-wired internet service to rural America also be part of universal service under the statute? Well, again, that would depend in part on whether that service is classified as a telecommunications service, as the court may be aware. That subject is a rather fraught subject and there is considerable disagreement about that within the commission. So it's possible. It's possible. Or maybe, or reasonable people would disagree with each other. A cellular flip phone? You're talking about providing the phones? That, again, is not, would probably not be, because it's not a product as opposed to a service. Okay. And then what about funding for private research on rock launching technology so that bringing satellite internet to rural America would eventually become cheap? The statute? That's a really interesting hypothetical, Your Honor. It's not something that had ever occurred to me, but I think that's well beyond what would be considered under universal service. What if Congress said, we're going to abolish all current taxes and we're going to authorize the IRS to calculate how much money the government needs for all of its current programs, and the IRS will compel contributions from every American until the budget is met? Would that be an unconstitutional delegation? Again, it would depend on whether an intelligible principle has been applied as the way you've described it. I don't think there is an intelligible principle there. I know what these petitioners have argued is that somehow this is- And somehow this will be, this currently exists and the IRS will decide how much, we'll just do the math. We'll do some fact-finding, how much money needs to be raised, and then they'll- Again, it's, there has to be some sort of guidance when it comes to what policies are they considering? The universal service program here is different from that scenario in the sense that, for one thing, there was a long history. For 60 years, there had been a universal service program when section 254 was passed. And that history- And that history informs the way you read the statute. And we have another program with a long history, Judge Millett mentioned Medicare. Medicare, sure. And I understood, if I'm not wrong, that the discussion would be primarily about Medicare spending dispersals rather than revenue collection. That's my understanding too. Do you think that Congress could, instead of setting the tax rate for Medicare withholding that I see on my pay stub every year, they could abolish that and just say to CMCS, you decide how much money needs to be raised each year for Medicare? If Congress did that, it would have to give more specific policy guidance to Medicare, to the HHS, as to how to determine those numbers in the same way that Congress in this statute, in section 254, laid out specific principles. There's about six principles here, equitable, non-discriminatory- Affordability, reasonable comparability. So with those six principles, then Congress could give CMCS those six principles and say, you decide how much money needs to be raised for Medicare each year. It's possible. The devil is in the details. But again, this system- And I know there's a suggestion, there's a suggestion that the petitioners have made that somehow if this is upheld, that that sort of approach is going to sweep the government. Well, this statute has been in place for 25 years, and it remains. Let's say you were to lose this case. Do you think it would bring down any other government programs with it? It's possible. I just don't know, Your Honor. I don't know enough about- And I'm so grateful to colleagues for being so patient with my questions. Who do you think are the primary beneficiaries of universal service? Do you think it's customers or carriers? Well, both of them benefit. I guess if you're talking about the primary beneficiaries, and this is consistent with what Judge Ginsburg found in Rural Cellular too, that carriers benefit from the expansion of universal service, the expansion of the network, because- Judge Brown in Rural Cellular 1 said that the customers were the primary beneficiaries, but maybe they disagree with each other. Do you agree with Judge Ginsburg? The truth of the matter is, Your Honor, that this issue about whether it's a fee or a tax is a frolic indeed. It doesn't matter because under Skinner, the Supreme Court has made clear the same test applies to taxing delegations as to all other delegations. That's the intelligible principle test. And it's our position that this court has already decided that issue in Rural Cellular 2 and that precedent- Taxing means you're taking money from Peter to pay Paul. And traditionally, that decision is made by Congress. Right? And had it been made by Parliament shortly, forever after they executed Charles I. That's certainly what the petitioners are arguing. The Supreme Court has found- You think it's a general principle, it's fine for Congress to delegate to agencies. How much money will be taken from Peter in order to pay Paul? I think the Supreme Court has said in Skinner that a delegation is permissible. And it pointed out that it may well be that Congress, in delegating that sort of authority, should be especially circumspect about doing so. But it also said that level of prudence is not required by the Constitution. So it's still Congress that passes the statute that says, this is how we're going to do our taxing. Right? Yes, that is correct. So as to hypotheticals about rockets and things like that, is it- Am I correct that the statute itself not only defines telecommunications services, but says for something to qualify as a universal service? In section 254C, that it has to be through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers, and been deployed in a public telecommunications network by telecommunications carriers. That's right, Your Honor. And that- Is that for rockets yet? No, of course not. And the point there is, this again is the emphasis that it's not just about the SEC funding any new technology that comes down the pike. There has to be- There are statutory definitions and limitations- Yes. In addition to your regulations. Congress doesn't just open the doors here and say- Absolutely. Absolutely. It's up to you to make it right. And the Commission is bound to consider those factors when it decides to change the definition of universal service. And those considerations basically go to not just the evolution of technology, but the evolution of the marketplace. So that, for example, when Americans start abandoning their wireline phones and using more wireless phones, it makes sense, Congress recognizes, it makes sense for the Commission to shift its universal service efforts to promoting mobile telephony. I had just one on- I know you say it doesn't matter if it's a tax or a fee, but on the other hand, we as courts would want to be extra careful- Sure. ...about that line. We want Congress to. And I'm struggling with understanding how you would define and help us identify the difference between a tax and a fee, because this isn't a fee like I pay for a parking spot, where I pay, I get. And how much each company pays and the relationship of that to how much they're going to get back in benefits is at least much less clear to me and less direct. Some may get more, some may get less. And so I don't have a sense. For something to be a fee, what evidence do I need- what evidence do you need to show of- is it generic benefit to the industry, or is it that each- is the definition of covered carriers here ensure that at least they get some benefit from that, even if it isn't in proportion to what they're paying, or how does that work out? I think, again, going to the court's discussion of this issue of rural cellular, too, the carriers benefit from the network effects of the expansion of the network. Their services, regardless of how much they're actually paying into the universal service fund, they benefit from a wider network where more people are on the internet, where more people are on the telephone network. Their service becomes more valuable. And I think that's the- in this context, anyway, that's the way you can distinguish between a fee and a tax. And Congress made that finding? Or the FCC? Or do we not need a finding? The court made that finding, actually. But the- in discussing this issue in rural cellular, too. Did you guys argue it? Did you have- do you have a factual basis for it? Do you- I'm just trying to figure out where it came from. Well, I think we did make the argument that, again, this was- I suppose this is the basic theory of universal service, that carriers benefit from- not just consumers benefit, but carriers benefit from a broader network because their service becomes more valuable. The more people you have on the network, the more valuable your service is. All right. Thank you very much. Thank you, Your Honor. Mr. Carr, we'll give you three minutes. Oh, that's right. Not Mr. Carr, Mr. Gelson. I apologize, Mr. Gelson. Thank you, Your Honor. I appreciate the time. I'd like to just add a few observations in response. The product-service distinction, I'm not sure that the FCC has ever adopted that before. I would be surprised to know that the FCC would disclaim the ability, for example, to provide cell phones to facilitate telecommunications- Is there a definition in the statute of telecommunications service? It's a pretty flexible definition, Your Honor. Where is that definition? I believe it's in section 251. Sorry, 53. You don't happen to have what it says, do you? I could grab it for you if you'd like. I don't have it. I didn't bring that for rebuttal. Of course, it's okay. Sorry about it. I have it if you want it. Okay, that's okay. I'll carry it. I think if my clerk's right, it means the offering of telecommunications for a fee directly to the public or to such classes of users as to be effectively available directly to the public, regardless of the facilities used. That's the definition of telecommunications service. I think the important point here is that the FCC won't disclaim the ability to tax internet streaming services. This definition is incredibly broad and malleable. And even if telecommunications services somehow did limit the area in which the FCC could roam free, the Supreme Court's decision in Panama refining forecloses that as an escape from a non-delegation challenge. That case was limited to hot oil, which is significantly more narrow than here. And yet, the Supreme Court still found... This is something we do do, right? We could look at a statute that says service. We could whip out our dictionaries and look at service and product and see how they're defined and figure out whether service includes equipment or not. It hasn't been treated that way for 90 years. It suddenly turned into equipment. And it's an individualized property equipment as opposed to wires under the ground. Even if telecommunications services... The court could do... I mean, there's a principle here that not only would be intelligible to the FCC, but enforceable by a court. Now, maybe the answer would be, in fact, Congress says something that suggests that it is cell that would be Congress's choice subject to statutory interpretation, right? We would have to decide that Congress said that. We'd be able to do that, right? This court could interpret telecommunications services, yes. I agree with that. Not including... I haven't done the statutory interpretation inquiry, but there's something that courts could review and determine whether it was whether products, individualized products are in or out, correct? This court could do that review. And we have to still ensure that something that's a substantial number of consumers are signed up for and that telecommunications provider provide in their public systems. The problem is that once you get into the definition of universal service and universal service principles, the principles are listed in precatory language, that they're all couched and should, and that multiple courts have held that they are vague and not rational. Yes, that's respectfully not very true. So it says they shall follow those principles, right? And your argument is essentially they're non-binding guidance to the FCC. But by my count, we've got three courts of appeals that have actually remanded to the FCC or violated either the equitable and discriminatory requirement, the affordability requirement, sufficiency. And every one of those cases and us in the rural cellular cases treat those as legal requirements that the FCC has to follow. How is your argument reconcilable with those decisions? So I have two points. The first one is that most of the remands were for failure to adequately explain the decision-making. So book one says it is contrary to the statute to impose this scheme on ComSat because it was not equitable and non-discriminatory. That is an enforceable legal limit, right? Even if there is some enforceable legal limit, there still has to be clear delineations. And the best analogs for this case are going to be Panama Refining and Schecter Poultry, or even if you can find some limits when the executive is given the ability to balance in a way multiple vague provisions that allow them to roam free in a field of legislative responsibility. I just want the best comparison, Whitman. So there is an incredibly broad delegation, the EPA, to determine air quality standards that are requisite to public health. What the court essentially said is requisite means enough but not too much, and you don't need determinate criteria. And here we've got sufficient, yet rates must remain affordable. Why isn't that sort of a direct analogy? The first distinction is that in this case we have a whole list of factors and that, for example, Alenko and a few other courts have said that if an agency wants to disregard one in favor of the other, as long as they explain it, they can disregard some of these principles. So it's not like there is one determinate criteria. It's the agency's ability to pick and choose between those principles in any given case. That's what makes it more like Schecter Poultry and Panama Refining than it does Whitman. The other distinction is that in Whitman, the limitation that it's enough but no more came from a definition provided by the Solicitor General during oral argument. The FCC has never claimed that sufficient says enough but no more. In fact, they under-collect and they over-collect. They've been sued by carriers for not raising enough. It's certainly not a determinate amount, but what the court has said over and over, cases like Whitman and others, is that you can leave a measure of discretion so long as there are guiding principles. It seems to me that sufficient levels and keeping rates affordable in the ways we said in rural cellular are telling the agency what to do to a sufficient extent. I think what was very clear in Whitman was the court was saying, there's still a lot of area for judgment here. That's okay. It seems like you're imposing a much stricter test here. I would point to the government's own point that this situation of this statute is unique. There hasn't been anything like this since Schechter-Polshy or Panama refining. Not only does it have vague standards, which may be sufficient in some of these variegated and technical areas, but it has multiple vague standards that the agency is then allowed to pick and choose from. Then it allows the agency to add its own principles and redefine universal service. The fact that that one standard, as narrowed by the Solicitor General, was sufficient in Whitman is not enough to resolve this case, especially given all those additional considerations. Has the Federal Reserve not raised money from member banks all over the country, fund services and security programs and things like that? The Federal Reserve has a fee collection structure. Is the exact amount prescribed by Congress? Again, I'm not an expert in the Federal Reserve, and I would be hesitant to delve into that one. But that one's definitely raising funds from banks, right, for reserve services? If Congress had given the Federal Reserve the same discretion that we see here, with no cap or rate, with multiple factors to balance, the ability to redefine the factors, then yes, it would raise an unconstitutional non-delegation problem. But that's not the regime that the Federal Reserve is under. As the government has stated, this is a unique case. The courts have not seen it since the 1930s with Panama Refining and Chester Poultry. I've been trying to think through. Imagine a regime that has one vague piece of statutory guidance, and then imagine another regime that has six vague pieces of statutory guidance. Is the latter a more intelligible principle or less intelligible? You could imagine it's more because there's more guidance. You could also imagine it's less because it's like vagueness to the sixth power. Or maybe it's just equally vague. In a situation where the agency can pick and choose between vague principles, it's more vague. I also have been thinking, J.W. Hanson, in customs versus taxes. I wonder if you could help me think this through. Taxes seem to be quintessentially legislative, domestic taxes. Customs seem both legislative and foreign affairs, which the executive has significant inherent discretion and has traditionally been given an exercise of significant discretion in the realm of foreign affairs. That's a fair distinction between customs and taxes, or do you think it's an irrelevant one? Yes, that's a fair distinction. Why? I mean, just for the reason. Because in the context of non-delegation, multiple courts, I believe the Supreme Court has recognized that when another entity has independent power in that area, the realm of discretion to delegate authority is broader. The president has authority over foreign affairs, and so the customs context can be different. The same is, for example, in Lichter, which is a wartime statute, the president is the commander-in-chief, has separate authority over wartime affairs. That makes the non-delegation calculus different. Do you know of any court that has said that, about customs versus taxes? I don't know of a court that has said it about customs specifically. You're saying that the express constitutional power to execute the laws does not qualify? By the executive power. The executive power, are you saying it has to be like a specific little mentioned one like an inner chief power or foreign affairs princes, these types of things, or is it the fact there's a constitutional assignment to the executive branch, to the president, to basically execute the laws enacted by Congress? It means put them into effect and enforce them. That would count the same as the commander-in-chief role? The executive power is about enforcing the laws passed by Congress, which is separate from areas where the Supreme Court has recognized that the executive might have its own independent power. Sorry, I'm getting confused when you say where the executive has its own independent power. I thought its own independent power included the execution of the law. Is that not right? The president's power to execute the laws is wholly dependent on Congress passing those laws. I understand. I will give you that, but once the law is passed, the president's authority to execute the law, does that count in the same way that you said the president's commander-in-chief role or shared foreign relations role doesn't answer those questions, or we don't get to count that? I don't believe it's the same because it's wholly dependent upon the statute passed by Congress. Okay, but the ability of the president to conduct a war is wholly dependent on Congress declaring war? That is a fraught question, but the executive has long maintained for decades that the president has independent authority to engage in hostilities overseas. Not to declare war, but to engage in hostilities overseas. We could get into the technicalities of where that line is, but I mean, recently... So, in fact, there's shared and there's debates about these lines. It's still a special power for the president in the way the power to execute laws, even there's some shared responsibility, perhaps, in executing and figuring out the details of the execution. That's no good. The execution of the laws when they don't implicate one of the president's separate constitutional powers is just bound in a different way by the non-delegation doctrine. Okay. No court has said that. There's absolutely nothing whatsoever in the text of the Constitution that suggests that, that the plan to achieve power is greater or more independent, as we just discussed, than the power to execute and enforce laws. So, where are you getting that from? Courts have been willing to derive certain presidential powers directly from the Constitution. The executive power, the ability to execute the laws is derived from... The ability to execute the laws is necessarily derivative from a statute passed by Congress. Therefore, the courts must look specifically to that statute. Our special power to interpret statutes really isn't all that special. It's an entirely derivative of Congress passing statutes. So, that's not really Article 3E enough. Well, I am not aware of a court ever interpreting a statute that wasn't passed by Congress. And so, I think that... Right. So, ours is completely conditional power. But the courts have independent authority, have some sort of shared authority over their own procedures, for example. Well, I think Congress is, but we can make rules. The Rules Enabling Act. I'm sorry, the Rules Enabling Act? Yeah, that's our procedures and rules. Are you talking about common law? I worry that we're getting far afield. Well, I'm just trying to understand. You seem to think you were embracing a distinction here within the Article 2 power, that I'm just trying to understand if there's any historical, precedential, or textual hook for it. And it sounds like no. I mean, I think that the Supreme Court has multiple times recognized that, like, for example, wartime statutes are different than other statutes. If you want, like, the easiest way to look at this, like, the Youngstown tripartite distinction about when the president can act distinguishes when the president has independent powers versus when it's... Can I just kick this all started with your argument that somehow this being characterized as a tax would make the analysis different, right? And isn't this as simple as reading Skinner, where it says, we hold that there is no difference? The best reading of Skinner is that the non-delegate... I cannot imagine this Court writing opinion that says, when the Supreme Court said, quote, we hold that the delegation of discretionary authority under Congress's taxing power is subject to no constitutional scrutiny greater than that we have applied to other non-delegation challenges. What does the next sentence say? That the Supreme Court described that as a holding, but... I think we would have to say, we just think that wasn't really that important in that case. I just don't think we can do that. So Skinner did not purport to overrule NCTA. It said that they were inconsistent. NCTA said that using the term public interest in raising revenue raised constitutional issues. Skinner did not purport to overrule cases like Estrada that said that the scope of permissible delegations depends on context. And so while we may apply the same test here, and while the Court may characterize it as with a statute like this, closest analogs, they said it wasn't sufficient. And in the cases where there has been revenue raising, a common theme is that there is some sort of objective limitation to stop those delegations. It would be the first time courts have sanctioned an unrestricted raising of revenue. Other than Lichter. Lichter was a wartime statute, yeah. Some of the discussion's been about, I think, a distinction between carrier equipment, like the wires under the ground, and customer equipment, which maybe wouldn't be able to be covered under the Universal Service Fund. Do you know of any examples where the FCC has covered customer equipment under Universal Service? Maybe there are none. Maybe it's statutorily prohibited. Not that I'm prepared to, not that I don't have an answer for that for you at the moment. Any questions? Judge Garcia, in response to your Lichter question, Lichter was also individualized determinations. It wasn't a broad rule. It wasn't legislative in nature. What the executive was doing, they were determining specific contracts on a case-by-case adjudicatory basis. It's not the same. Your Honor, if I may have 30 seconds to respond to two things which were asked earlier. Judge Walker, you asked about, and Judge Garcia, you asked about the Regulations Governing Use Act. I would just point the court to language in topic two, it's on page 328, that identifying a precise amount is an imprecise exercise. Whatever Use Act is doing, whatever guidance is given, there's still discretion in that area. In addition, again, I would just emphasize that the Supreme Court simply declared the most telling indication of a severe constitutional problem is the lack of historical precedent. This hasn't been seen since Schechter, Poultry, and Panama refining. Those delegations were unconstitutional. We would ask the court to vacate the contribution factor for the second quarter of 2023. Okay, any questions? Thank you very much. The case is submitted.
judges: Millett, Walker, Garcia